STOELTING BROTHERS COMPANY and others, Appellants, vs. STOELTING and others, Respondents.

SAME, Appellants, vs. SAME, Respondents.

*October 12—November 14, 1944.*

116

118

For the appellants there were briefs by *Bloodgood & Passmore,* attorneys, and *William E. Burke* of counsel, all of Milwaukee, and oral argument by *Mr. Eric W. Passmore* and *Mr. Burke.*

For the respondents there was a brief by *Basseuner, Humke & Poole* of Sheboygan, attorneys for Adolph Stoelting, and by *Hougen, Brady & Murphy* of Manitowoc, attorneys for Otto and Gustave Stoelting, and oral argument by *H. S. Humke* and *A. L. Hougen.*

MARTIN, J. The parties are agreed on the questions involved in this appeal. They are: (1) Have Otto and Gustave Stoelting the right to vote the shares outstanding in their names and deposited in escrow for the election of directors other than Adolph, Carl, and Frederick Stoelting? (2) Are the proxies executed by Otto and Gustave Stoelting to Adolph, Carl, and Frederick Stoelting revocable?

The trial court answered both questions in the affirmative. Appellants contend they should be answered in the negative. Appellants argue that the purchase and sales agreement did not expressly reserve to the sellers, Otto and Gustave Stoelting, any voting rights; that they parted with the physical possession of the stock certificates, indorsed them in blank, and deposited them in escrow with the Citizens State Bank of Kiel.

The escrow agreement contains no restrictions on the voting rights of Otto and Gustave Stoelting of the stock outstanding in their respective names and placed in escrow with the bank. In their brief appellants state:

"It is the position of the plaintiffs that the agreement between the parties was that Otto and Gustave Stoelting were

transferring to Carl and Frederick Stoelting the former's interests in a going business, these interests consisting of a proprietary ownership of the assets of the business and its management and control."

According to the terms of the agreement Otto and Gustave each sold one hundred eleven shares of their stock to Carl and Frederick and gave them an option to purchase annually additional shares. With the two hundred twenty-two shares acquired by Carl and Frederick, plus the three hundred thirty-three shares owned by their father, it gave the father and his two sons a total of five hundred fifty-five shares of stock out of a total outstanding issue of nine hundred ninety-nine shares; that gave Adolph, Carl, and Frederick control of the corporation.

We are dealing with a corporate entity and any conveyance of interest therein could only be made through a sale and transfer of its capital stock. We cannot now, through a construction of the agreement or otherwise, change the contract of the parties. The contract is plain, unambiguous, and leads to no absurd result.

"When the terms are clear and unambiguous they must control; they are not affected by previous negotiations nor subsequent conduct of the parties." *Casgrain v. Milwaukee County,* 81 Wis. 113, 118, 51 N. W. 88; *Owens v. Hughes,* 188 Wis. 215, 216, 205 N. W. 812; *Schneider v. Allis-Chalmers Mfg. Co.* 196 Wis. 56, 62, 219 N. W. 370.

It is elementary that an option to purchase corporate stock does not transfer to the optionee the right to vote it. Appellants, in their brief, state that "all the parties understood that Otto and Gustave were no longer stockholders, and that the phraseology of the agreements was to protect the sellers from a heavy income tax." What, then, would become of the four hundred forty-four shares retained by them after selling the two hundred twenty-two shares to Carl and Frederick?

Three days after Carl and Frederick had acquired the two hundred twenty-two shares from Otto and Gustave, Adolph, Carl, and Frederick went to Milwaukee and there held a stockholders' and directors' meeting at the offices of their Milwaukee counsel. It should be said that their counsel, who prepared the minutes of the stockholders' meeting, assumed that all of the stock belonging to Gustave and Otto Stoelting had been acquired by Carl and Frederick Stoelting. This stockholders' meeting at Milwaukee on February 19, 1943, was held without notice to, or knowledge of, Otto and Gustave Stoelting.

Thereafter, late in September or the forepart of October, 1943, plaintiffs' counsel advised that a proxy be obtained from Gustave and Otto Stoelting, which was done and was antedated to February 16, 1943. Counsel also advised that a waiver of notice of the meeting of February 19, 1943, be obtained from Otto and Gustave. The trial court found that the proxy procured from Otto and Gustave and antedated was so procured for the purpose of validating the acts of the stockholders' meeting held in the Milwaukee office of the company's counsel on February 19, 1943. The court further found as a conclusion of law that the proxy given by Otto and Gustave was not coupled with an interest and was duly revoked on February 8, 1944. Carl Stoelting, being examined adversely as to the purpose of obtaining the proxy from Otto and Gustave, testified:

"*Q*. Why did you order the proxy dated back? *A*. Because until that proxy was executed the proceedings of the corporation had been a mess.

"*Q*. Which proceedings? *A*. The first stockholders' meeting.

"*Q*. Why was it a mess? *A*. Because it had gone on the assumption that Adolph, Fred and Carl were all the voting stockholders.

"*Q*. So you got a proxy dated—executed and delivered some time in September, 1943, and dated it back as of the 16th of February, 1943? *A*. Right.

"*Q.* Is that correct? *A.* Correct.

" . . .

"*Q.* Did you order and direct that that be done? *A.* Yes, I did.

"*Q.* Did you discuss it with your father? *A.* I did.

"*Q.* When? *A.* Before the proxy was even drawn.

"*Q.* What did you say to him? *A.* It was explained by Attorney Passmore that it was necessary to take this step so that all previous stockholders' meetings since the 16th of February, 1943, be in proper order.

"*Q.* Are you sure that that was the only reason you got that proxy? *A.* Positively.

"*Q.* You mean to tell me that the only reason you got this proxy and had Otto and Gustave sign it was to make the stockholders' meeting of February 19, 1943, legal? *A.* Yes, sir, that was the only reason.

"*Q.* For no other reason? *A.* No, sir.

"*Q.* You are sure about that? *A.* Positive."

Can there be any doubt as to the specific purpose in procuring the proxy from Otto and Gustave? The above testimony is that of the secretary, and he explains in no uncertain language the reason for procuring the proxy. Furthermore, there was no occasion other than as indicated for getting a proxy from Otto and Gustave, because at that time Adolph and his two sons had the controlling vote. It further appears that when the contract was signed both the company's auditor and Attorney Currie, who prepared the purchase and sales agreement, stated that Otto and Gustave retained the right to vote their unpurchased stock.

The trial court's decision and findings disclose a careful study and analysis of the evidence. The findings are amply sustained by the evidence and call for an affirmance of the judgment.

*By the Court.*—Judgment affirmed.